NUNAN (HO AH KOW v.). See Case No. 6,-546.

---

## Case No. 10,379.

### NUNEZ v. UNITED STATES.

[Hoff. Land Cas. 191.] [1]

District Court, D. California. Dec. Term, 1856.

LAND CLAIMS—FREMONT CASE.

This claim is valid under the ruling of the supreme court in U. S. v. Fremont [18 How. (59 U. S.) 30].

---

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

Claim [by Sebastian Nunez] for six leagues of land in Tuolumne county, rejected by the board, and appealed by claimant.

Stanly & King, for appellant.
William Blanding, U. S. Atty.

OPINION OF THE COURT. The claim in this case was rejected by the board. The grant was issued on the twenty-second of February, 1844; but no approval of the departmental assembly was obtained, nor was juridical possession given. The authenticity of the grant seems sufficiently established. The original document is produced, and the expediente is found in the archives of the former government. The confirmation of the claim is, however, opposed by the United States on the ground that the claimant, from the date of his grant until long after the acquisition of the country, neglected to comply with any of the conditions. The grant was issued, as has been stated, in 1844. It clearly appears that from that time until about the year 1850, two years after the acquisition of the country, the claimant neither occupied, cultivated or took possession of the land conceded. No effort whatsoever on his part to perform the conditions appears to have been made, and the only explanation of the delay to be found in the evidence submitted to the board, is contained in a single sentence of the deposition of Francisco Perez Pacheco, to the effect that there was no security in putting cattle on the rancho for several years after the grant.

The testimony of Jacinto Rodriguez and Benito Diaz has been taken in this court, and is chiefly relied on as affording the necessary explanation of the omission of the claimant to fulfill the conditions. But their evidence is not very satisfactory. The first of these witnesses states that he cannot tell certainly when the first settlement was made, but the land was taken possession of as soon as it was safe to do so on account of the savage state of the wild Indians. In reply to an inquiry as to his means of knowing these facts, he states that he used to go there to catch wild horses, and also as a soldier to pursue the Indians. Benito Diaz testifies in nearly the same terms, that he does not know exactly when the first settlement was made, but that he knows possession was taken as soon as the wild state of the savage Indians permitted, and that the hostility of the Indians prevented possession from being taken. He adds that he knows these facts, because he was mining in the neighborhood, and frequently passed there; that he is forty-one years of age, and has lived in that neighborhood many years. If by mining the witness means gold mining, then his knowledge of the country derived from that occupation could not have been extended further back than 1848 or 1849. But if he means some other kind of mining carried on before the conquest of

the country, it is not explained why the claimant could not have cultivated his rancho with as much security as the witness carried on his own business of mining. If he has, as he states, resided many years in the vicinity, that fact would seem to show that the claimant might have done the like.

But another witness was produced before the board whose testimony, however, is not alluded to in their opinion; probably for the reason that it was considered unworthy of credit. Francisco Perez Pacheco testifies that the land has been occupied by the present claimant "for about two years." The deposition bears date May 4th, 1852. He also says that a house and corral have been on the land between two and three years. This witness is a colindante, and one to whom the governor referred for information, and on whose report the grant was made. His means of knowledge must therefore have been as good as those of any other person. José Abrego, however, ignorant apparently of the previous testimony of Pacheco, and with a zeal somewhat outstripping his discretion, does not hesitate to swear (March 3d, 1853) that "during the last eight years the land has been in the possession and occupation of the claimant; that he has used it principally for grazing purposes; constructed and occupied several small houses by himself and those in his employment; has constructed several large corrals for the herding of cattle, and has cultivated portions of the land during all that time." This witness does not seem to have been aware that the theory of the case on the part of the claimant was, not that he had shortly after his grant occupied, cultivated and stocked his rancho, and fully performed all the conditions, but that he had been prevented from doing so by Indian hostilities. Nor does he appear to have considered that the court would be slow to believe that such extensive improvements could have been made, and the rancho stocked with cattle, rendering necessary the construction of "several large corrals," and the fact remain entirely unknown to the nearest neighbor of so enterprising a ranchero. The testimony of this witness suggests a painful doubt as to the reliability of much of the evidence taken in this class of cases, and perhaps justifies a regret that we are not authorized to exact in every instance evidence of occupation and cultivation under the former government as the best, if not the only check upon forgeries and frauds, in cases where the archives contain no evidence of the grant. Rejecting then the testimony of this witness as wholly unworthy of credit, the question recurs—has the claim been forfeited by neglect to perform the conditions?

Under the view formerly taken by this court, the grant of the governor, issued before the approbation of the assembly was obtained, was regarded as inchoate or imperfect, and as conveying of itself no title

to the land. It was considered, however, that while the grantee had, on the faith of this imperfect title, fulfilled the conditions, and thus rendered to the government the only consideration for the grant exacted by their laws or policies, he had, on showing that fact or a performance cy-prés, or perhaps even an effort to perform, which had been frustrated by unforeseen obstacles, an equitable right to a confirmation. It was not supposed by this court that if by the grant an estate vested in the grantee, that that estate could be divested unless by a proceeding by way of denouncement under the former government. It was considered, as observed by the supreme court in U. S. v. Fremont [18 How. (59 U. S.) 30], "that the grant subjects the lands to be denounced by another, but that the conditions do not declare the land forfeited to the state on the failure of the grantee to perform them." When, therefore, no denouncement had taken place, it was not deemed competent for this court to inquire into and declare forfeitures which might have accrued under the Mexican government.

It was also considered by this court that, inasmuch as the assembly and supreme government had the right, at their discretion, to annul the grant, our government had succeeded to that right; and was at liberty to exercise it unless under circumstances which would have made it inequitable in the former government to have done so. If then, so radical a change as that which has since occurred had taken place in the value of the land, the condition of the country, and the policy and even duty of the government, the Mexican authorities would clearly have been justified in withholding their approval, unless by the settlement and occupation of the land, on the faith of the grant, they had already received the consideration for it. The equitable obligations which were binding on them, are binding on us, but none others, and the substantial equity of the claimant was supposed to consist in the fact that he had received an imperfect or inchoate title, and had performed the conditions during the existence of the former government. Where, however, the grant was rendered complete by the approval of the assembly, and the title of the Mexican nation had been finally divested, it was not considered that we could inquire into previous forfeitures, unless such as had been taken advantage of and declared by the former government. It is decided, however, by the supreme court, that by an unapproved grant a right or interest vested in the grantee, which remained in him unless forfeited or divested under the former government. Such forfeiture did not, however, accrue on those cases alone where a denouncement of the land was made. It also took place and must be declared by this court, wherever there has been unreasonable delay in performing the conditions, and such

as to authorize the presumption of abandonment.

What delay is to be considered unreasonable, and as giving rise to this presumption, the court does not explicitly state; nor does it perhaps admit of precise definition. It would seem more in accordance with the generous and benignant spirit with which the supreme court has viewed these cases, to hold that no delay shall be considered so unreasonable at to forfeit the land, unless such as would not have been excused by the former government if the land had been denounced. The time assigned for the performance of the conditions was usually one year. But this rested wholly in the discretion of the governor. By the usage of the country the excuses of the grantee for nonperformance were indulgently received, and even when the land was denounced as vacant a further time to fulfill the conditions was usually allowed, if the government was satisfied that the grantee intended to occupy his land and had been unexpectedly prevented. The delay which the supreme court regarded as working a forfeiture of the vested interest of the grantee, is evidently something more than such as would constitute a technical breach of the conditions. It must be such "unreasonable" delay as justifies the belief that in point of fact the grantee voluntarily abandoned his land. But such an inference could hardly be drawn, unless his negligence was protracted and susceptible of no other explanation, or unless he had left the country, or obtained and settled upon some other grant, or had by some other unequivocal act or omission clearly indicated his intention to renounce and surrender his property. When, therefore, the court is called upon to declare that a grantee of land has voluntarily abandoned the rights he is admitted to have acquired, the question is not unattended with difficulty; and perhaps the test already suggested may be found as safe as any other, viz: that he shall be deemed to have forfeited his lands only under such circumstances as would under the laws and usages, have deprived him of it had it been denounced by another.

In the case at bar the grant was made in 1844. The grantee had, therefore, only two years and some months during the existence of the former government, within which to perform the conditions. The political and other disturbances, which were reviewed by the supreme court in Fremont's Case, as excusing or accounting for Alvarado's neglect to perform, must have presented equal obstacles to the grantee in this case; and the hostility of the Indians in this case as in that, probably, though the fact is not very satisfactorily shown, increased the difficulty of effecting a settlement. It is true that others appear to have settled upon neighboring ranchos. For the grant is bounded by the ranchos of two colindantes, and Francisco Perez Pacheco, by the informe and his own

deposition, is shown to have had a rancho in the vicinity. But a settlement might have been practicable to a wealthy man with numerous dependents, while a poor man might have found it impossible to occupy alone an extensive tract, separated from his nearest neighbor by a distance of several leagues.

I am inclined to think that if, under the circumstances of this case, the land had been denounced, the Mexican authorities would, under their laws and customs, have accepted the excuses of the grantee, and allowed him a "proroga" or extension of time; and the fact that no denouncement was made is of some weight, as showing that no one else offered or found it practicable to fulfil the conditions. I have felt much hesitation and difficulty in arriving at a conclusion in this case. But assuming as I am bound to do that the grantee acquired a vested interest by his grant, I have not felt authorized to say that the circumstances show that he voluntarily abandoned or surrendered his rights during the existence of the former government. What circumstances the supreme court may hereafter regard as authorizing the presumption of abandonment. we cannot now say. But it has seemed to me that they should be strong and unequivocal before we can declare that a right of property once vested in a grantee of the former government has been forfeited or lost by an abandonment of it.